STATE OF MAINE                                        SUPERIOR COURT
ANDROSCOGGIN, ss.                                     CIVIL ACTION
                                                      DOCKET NO. CV-19-20

SHANEA KENNEDY,                         )
an adult individual resident of Livermore )
Falls, County of Androscoggin, State of  )
Maine,                                   )
                                         )
    Plaintiff,                           )
                                         )
v.                                       )
                                         )
BARCLAYS SERVICES, LLC,                  )
a Delaware corporation with a place of   )                FEB 4 '19 PM 1:16
business in Wilton, County of Franklin,  )                ANDRO SUPERIOR COURT
State of Maine,                          )
                                         )
    Defendant                            )

## COMPLAINT AND REQUEST FOR JURY TRIAL
## WITH INJUNCTIVE RELIEF SOUGHT

Plaintiff Shanea Kennedy ("Ms. Kennedy") makes the following complaint against Defendant Barclays Services, LLC ("Barclays"). She requests a jury trial and seeks injunctive relief.

### Parties

1.  Ms. Kennedy is a female citizen of the State of Maine, living in Livermore Falls, in Androscoggin County.

2.  Barclays is a Delaware corporation with a place of business in Wilton, Maine, and a registered agent in Augusta, Maine.

3.  Venue lies in Androscoggin County pursuant to 14 M.R.S. §§ 501, 505.

**EXHIBIT A**

### Procedural background

4.  This is a proceeding for declaratory and injunctive relief and monetary damages to redress the deprivation of rights secured to Ms. Kennedy by the Americans with Disabilities Act Amendments Act as Amended ("ADAAA"), 42 U.S.C. § 12101 *et seq.*, the Family Medical

Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq.*, Title VII, 42 U.S.C. § 2000e-2, the Maine Family Medical Leave law ("MFMLR"), 26 M.R.S. § 843 *et seq.*, and the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4551 *et seq.*

5. Ms. Kennedy filed a timely complaint with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC") on or about October 9, 2017.

6. Ms. Kennedy satisfied the requirements of 5 M.R.S. § 4622. Prior to filing this action, the MHRC issued a right to sue letter pursuant to 5 M.R.S. § 4612(6) and § 4622(1)(C) on or about November 9, 2018.

7. The EEOC issued a Notice of Right to Sue on November 29, 2018.

8. Ms. Kennedy exhausted all of her administrative remedies.

9. Ms. Kennedy timely filed this complaint in court.

### Jury demand

10. Ms. Kennedy demands trial by jury on all claims to the extent allowed by law.

### Factual background

11. Ms. Kennedy began working for Barclays in Wilton, Maine, in August of 2014. She worked at a call center answering in-bound credit card customer calls.

12. For three years, Ms. Kennedy had nothing of note in her personnel file. It wasn't until she was sexually harassed at work, triggering her post-traumatic stress disorder ("PTSD"), that Barclays began to discipline her.

13. On or about April 22, 2017, *Ms. Kennedy was sexually harassed while at work.*

14. Ms. Kennedy was sitting at her desk when she was approached by a male co-worker, MO. MO stood over Ms. Kennedy's desk and leaned in very close to her. He commented about Ms. Kennedy's facial piercings. MO said that he was in an open relationship

2

with his partner and that they were looking for another partner. MO gave Ms. Kennedy a suggestive sexual look.

15. Stunned and shaken, *Ms. Kennedy immediately reported the sexual harassment to Barclays.* A Facilitator named Jesse Haskell, whose job it is to report to managers, confirmed that he had witnessed the sexual harassment.

16. *Barclays did nothing in response to this report.* Barclays did nothing to protect Ms. Kennedy.

17. *Still, three days after the sexual harassment incident and Ms. Kennedy's report, Barclays had done nothing.*

18. On or about April 25, 2017, *Ms. Kennedy reported to Barclays again.* Ms. Kennedy specifically told a manager, Amanda Walsh, about the harassment and that it had triggered her PTSD and that she needed to get medical care. Ms. Kennedy told Ms. Walsh that she did feel suicidal at that moment due to the harassment. Ms. Kennedy told Ms. Walsh that she knew when she needed help and how to get it.

19. Ms. Kennedy took the next couple of days off from work to recover. She returned to work on May 3, 2017. She provided a doctor's note.

20. *Nineteen days later,* when Ms. Kennedy was cleared to return to work, still nothing had been done about Ms. Kennedy's report of sexual harassment.

21. Instead, when Ms. Kennedy came in for her shift on or about May 11, 2017, MO, *the sexual harasser, was working the same shift as Ms. Kennedy.*

22. When Ms. Kennedy saw MO working the same shift as her, she had a PTSD episode, which Barclays ought to have anticipated given that it was on notice of both the harassment *and* Ms. Kennedy's PTSD diagnosis.

23. Ms. Kennedy immediately spoke to a manager, Kristine Partridge, about having at PTSD episode and what was going on. She asked Ms. Partridge if there was any way that she

3

could leave work and return to work the next day and finish her shift. *Ms. Partridge replied that there was no way Barclays could accommodate this request.*

24. The following Monday, May 15, 2017, Ms. Kennedy notified her direct manager, Heather MacDonald, that she needed to go out on medical leave. Ms. Kennedy gave Ms. MacDonald her FMLA claim number, which is provided by Barclay's third-party FMLA administrator, MetLife.

25. Ms. Kennedy was admitted to the psychiatric facility at Maine General in Augusta the next day.

26. On or about June 12, 2017, Ms. Kennedy returned to work without restrictions, taking less than half of her FMLA time.

27. Her first day back, Ms. Kennedy participated in call-listening and trainings. No one at Barclays disciplined Ms. Kennedy for needing to leave work on May 11 for medical reasons.

28. Ms. Kennedy also followed up with her manager, Ms. MacDonald, about her complaint of sexual harassment. Ms. MacDonald acted like she didn't know what Ms. Kennedy was talking about, but said that this person, MO, wasn't working there anymore, apparently for other reasons. *This is a month and a half after Ms. Kennedy had reported being sexually harassed.*

29. From June 13 to June 22, 2017, Ms. Kennedy worked her shifts as normal and without incident.

30. On June 23, 2017, Ms. Kennedy was leaving to go to her car at the end of the day, around 6:00 p.m., and she noticed that her car had been severely keyed. She had parked in the Barclays' employee parking lot, as is required of all employees.

4

31.     Ms. Kennedy went back into the building and told the security guard that someone had keyed her car. The security guard took down an incident report and took pictures of Ms. Kennedy's vehicle.

32.     The following day, Monday, June 26, 2017, Ms. Kennedy followed up about who had keyed her vehicle. The male security guard told Ms. Kennedy that she would have to file a police report. Barclays would not allow Ms. Kennedy any time off the phones to file a report.

33.     On her own time, Ms. Kennedy met with the Wilton Police Department and told them her car was severely keyed on Barclay's property. The police advised Ms. Kennedy that the keying may be vandalism related to her report of sexual harassment.

34.     On June 30, 2017, Ms. Kennedy asked a manager, Ms. McGintee, for an update on the keying of her car in Barclays' lot. Ms. McGintee told her that there was "no evidence" that anything had happened to her car and refused to allow Ms. Kennedy to see the security tapes. ***She told Ms. Kennedy that Barclays won't be investigating***.

35.     On July 1, 2017, Ms. Kennedy experienced severe symptoms of vertigo at work due to changes in her medications.

36.     After treating her in the emergency room, Ms. Kennedy's doctors advised her to remain out of work.

37.     Ms. Kennedy immediately informed her manager, Amanda Haines, about needing to be out of work. She sent a new FMLA claim number that she had been given to her by Barlcays' third-party FMLA administrator, MetLife.

38.     On July 7, 2017, Ms. Haines contacted Ms. Kennedy via Facebook and told her that her FMLA claim was denied.

39.     Ms. Kennedy immediately called MetLife. A representative told Ms. Kennedy that MetLife had made a mistake with her paperwork and that the FMLA leave was actually

5

approved. The representative confirmed that the paperwork would take a few days to be corrected.

40. Ms. Kennedy returned to work on July 11, 2017, after taking about a week of leave.

41. That day, Ms. Haines disciplined Ms. Kennedy for having seven (7) "occurrences" of missed work and stated that that she should technically be fired but would be put on a Final Warning. *The "occurrences" included time that Ms. Kennedy was out on FMLA leave.* According to Ms. Haines, if Ms. Kennedy missed *any* time between July 11 and October 1, *no matter the circumstance*, it would be grounds for termination. Ms. Haines said, *"this was company policy."*

42. Ms. Kennedy informed Ms. Haines that her FMLA leave was in the process of being approved because there was a processing error. Ms. Haines replied that if the FMLA leave was approved that she would "take away" those occurrences.

43. Ms. Kennedy agreed to sign the "Final Warning" paperwork and also told Ms. Haines that she felt uncomfortable at work due to her report of harassment not being taken seriously and her car being keyed and that not being investigated.

44. Based on this report of sexual harassment and the fact that it caused the need for mental health treatment *in the past*, Ms. Haines assumed that *Ms. Kennedy must be dangerous because she has a psychiatric disability.* Ms. Haines asked Ms. Kennedy questions about suicide, and decided *a desire to commit suicide must be permanent* because Ms. Kennedy had thought about it (though not attempted it) in the past.

45. Ms. Kennedy went back to her desk and continued to take phone calls. Not forty (40) minutes later, Ms. Haines returned and told Ms. Kennedy she needed to follow her back into the meeting room. Ms. Kennedy asked, "why?" and Ms. Haines lied, saying that she just needed Ms. Kennedy to "fill out an incident report."

6

46. Instead of the meeting room, Ms. Haines walked Ms. Kennedy to the security guard's office. *Ms. Haines had called the police on Ms. Kennedy!*

47. Even though Ms. Kennedy reiterated that she was not suicidal, the police escorted her out of the building (due to protocol) in front of all of her co-workers.

48. After being evaluated by Evergreen Crisis, it was determined that Ms. Kennedy was indeed NOT a threat to herself or others, and she was released.

49. On July 13, 2017, Ms. Kennedy contacted the Barclays' "Whistleblowers" line (Employee Relations Legal Compliance, Faye MacLaughlin-Lagares). *She reported the sexual harassment, FMLA retaliation and disability discrimination.*

50. One day after reporting sexual harassment, FMLA retaliation and disability discrimination, *Barclays attempted to force Ms. Kennedy to undergo unnecessary medical exams and illegally take her out of work.*

51. Ms. McGintee called Ms. Kennedy into her office and put her on a conference call with Cathy Skinner in Human Resources. On the call, Ms. Skinner stated that she did not feel like Ms. Kennedy was "safe" to herself or to others and that she was to leave work and not return until she was evaluated by Humana and cleared to come back to work. Ms. Skinner also said that Ms. Kennedy *"needed an evaluation as part of her return to work, and it may be a condition of her continued employment."*

52. Barclays sent Ms. Kennedy home for an illegal medical exam in no way related to the essential functions of her job.

53. Once she got home to read the paperwork, Ms. Kennedy realized that *Barclays was asking her to release ALL of her personal health information.* She wrote an e-mail to Ms. Skinner spelling out the illegality of the request on all its many levels and reiterating the fact that she was NOT suicidal, she could do her job, that people with disabilities should not be treated as scary, and that she was making a complaint of additional discrimination.

7

54. Barclays took *no action* to address this report of discrimination.

55. Ms. Kennedy remained out of work from July 13 to August 17 due to Barclays feeling uncomfortable with a person with depression and PTSD working there, with zero evidence that she posed any sort of risk.

56. On July 19, 2018, having been kept out of work for a week now, Ms. Kennedy sent the following report to Ms. Skinner:

> *I believe I am being kept out of work due to bias about my medical condition. This is illegal discrimination. I would like it investigated. I also am requesting to return to work immediately.*

57. In response to this e-mail, Ms. Skinner set up a conference call the following day.

58. On the call, Ms. Kennedy also reported to upper management (Ms. MacLaughlin-Lagares from Employee Relations) that she felt discriminated against due to her disability. Barclays did nothing to address this complaint. Instead, Ms. MacLaughlin-Lagares informed Ms. Kennedy that ***Barclays would not be removing her attendance "occurrences" even though they were FMLA-related***. She also inexplicably told Ms. Kennedy, *"No one is telling you that you cannot return to work."*

59. Ms. Kennedy returned to work the following day, July 21, 2017. As soon as her manager, Ms. Haines, got in, she came up to Ms. Kennedy and loudly stated in front of others, "Hey, the Wilton Police Department is here for you again!" Ms. Kennedy was supposed to meet with an officer who was there to close out the case of her car being keyed.

60. Ms. Kennedy was humiliated by this behavior in front of her co-workers. Throughout the day, Ms. Kennedy's co-workers treated her differently, ignored her or would abruptly stop talking when she would approach them.

61. Ms. Kennedy initiated a meeting with Ms. McGintee and Ms. Skinner that day. She told the women that she felt distraught, abused and humiliated by what Barclays had put her through. She felt isolated and alone. Because of this, Ms. Kennedy put in her two weeks'

8

notice. Ms. Skinner responded, "Well, you don't have to work the two weeks. If you wanted to, you could quit today." Ms. Kennedy told her she wanted to work the two weeks.

62. Nevertheless, after leaving work, Ms. Kennedy received a phone call from Ms. Skinner stating that *she did not want Ms. Kennedy returning to the office.* Ms. Skinner said that she would feel more comfortable, and that Ms. Kennedy would feel more comfortable, if she was paid for her two weeks but did not to return to the office. Ms. Skinner told Ms. Kennedy that she could turn in her badge and pick up her things at a later date.

63. The next day, August 4, 2017, Ms. Kennedy received a message from Barclays stating that Whistleblowers had completed its investigation of her complaints, but they would not share any information with her.

64. At the end of August, 2017, Ms. Kennedy saw that Barclays was hiring an ADA Compliance Coordinator in the Wilton Office, which they had never had before.

65. As a result of the discriminatory and retaliatory actions of Barclays, Ms. Kennedy was harmed, and continues to be harmed.

## COUNT I
### Disability Discrimination: ADAAA, 42 U.S.C. § 12112

66. Ms. Kennedy incorporates and realleges the paragraphs above as if fully set forth here.

67. Ms. Kennedy was and is a qualified person with a disability as defined by the ADAAA, 42 U.S.C. § 12102(1).

68. Buying into the myths and fears about persons with intellectual disabilities, Barclays assumed that, because she had PTSD and at one time felt suicidal, she was not safe in the workplace. It also falsely assumed that anyone with PTSD must be suicidal and a danger to themselves and others. No medical document supports this assumption: this was just pure speculation motivated by bias.

9

69. Ms. Kennedy was and is qualified for the call-center position at Barclays since she satisfies the skill, experience, and other job-related requirements for the position, and since she was and is able to perform the essential functions of the position with or without reasonable accommodation.

70. Barclays, through its duly authorized employees and agents who acted on behalf of Barclays within the scope of their employment, intentionally discriminated against Ms. Kennedy because of her disability by forcing her out of work and refusing to allow Plaintiff to return to work without getting clearance from a third-party provider.

71. Barclays attempted to obtain Ms. Kennedy's entire medical record unrelated to her disability for no legitimate reason.

72. Barclays ultimately terminated Ms. Kennedy through the doctrine of constructive discharge because of its bias toward her.

73. In addition to being constructively discharged, Ms. Kennedy was otherwise adversely affected in whole or in part due to the intentional discrimination by Barclays against Ms. Kennedy based on her disability.

74. Barclays engaged in discriminatory action in the face of a perceived risk that its actions would violate federal law. Its acts and omissions were done maliciously or with reckless indifference to Ms. Kennedy's federally protected rights. Barclays made no good faith effort to prevent discrimination in Ms. Kennedy's workplace.

75. As a direct and proximate result of the intentional discriminatory acts and practices of Barclays, its agents and employees, including the refusal to provide a reasonable accommodation and discriminatory discharge of Ms. Kennedy's employment, she has suffered and continues to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of

life, costs associated with obtaining reemployment, embarrassment, damage to her reputation, and other past and future pecuniary losses.

## COUNT II
## Disability Discrimination: MHRA, 5 M.R.S. § 4571

76. Ms. Kennedy incorporates and realleges the paragraphs above as if fully set forth here.

77. Ms. Kennedy is, and was at all times pertinent to this action, covered by the provisions of the MHRA, 5 M.R.S. § 4553-A(1).

78. Ms. Kennedy was subjected to disability discrimination due to her employer's assumption that persons with intellectual disabilities are dangerous and that persons with PTSD are suicidal. In this case, Barclays assumed that, because Ms. Kennedy had at one time felt suicidal, she was not safe to be around others in the workplace. No medical document supports this assumption: this was just pure speculation motivated by bias.

79. Ms. Kennedy was and is qualified for the call-center position at Barclays because she satisfies the skill, experience, and other job-related requirements for the position, and because she was and is able to perform the essential functions of the position with or without reasonable accommodation.

80. Barclays, through its duly authorized employees and agents who acted on behalf of Barclays within the scope of their employment, intentionally discriminated against Ms. Kennedy based on what Barclays regarded as a disability and/or based upon Plaintiff's record of a disability by forcing her out of work and refusing to allow Plaintiff to return to work without getting clearance from a third-party provider.

81. Barclays ultimately terminated Ms. Kennedy through the doctrine of constructive discharge because of its bias toward her.

11

82. Barclays acted with malice or with deliberate conduct or in such a manner that, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward Ms. Kennedy can be implied. Barclays was also motivated by discriminatory intent.

83. As a direct and proximate result of the intentionally discriminatory acts and practices of Barclays, its agents and employees, including the refusal to provide a reasonable accommodation and discriminatory discharge of Ms. Kennedy's employment, she has suffered and continues to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, damage to her reputation, and other past and future pecuniary losses.

## COUNT III
### Retaliation: ADA, 42 U.S.C. § 12203(a)

84. Ms. Kennedy realleges and incorporates by reference the allegations set forth in the paragraphs above.

85. Ms. Kennedy engaged in protected conduct when she reported that she was being discriminated against because of her disability.

86. Barclays failed to take Ms. Kennedy's report seriously, and instead took adverse employment action against her by forcing her out of work and refusing to allow Plaintiff to return to work without getting clearance from a third-party provider.

87. There was a causal connection between Ms. Kennedy reporting disability discrimination and the aforementioned adverse employment action both in terms of temporal proximity between the reporting and the adverse action and also as evidenced by the disability-biased comments from Ms. Kennedy's supervisors at Barclays.

88. Ms. Kennedy was harmed by Barclay's actions.

89. Barclays was aware of the illegality of its conduct, yet engaged in – with reckless indifference and malice – retaliatory conduct against Ms. Kennedy.

## COUNT IV
### Retaliation: MHRA, 5 M.R.S. § 4572(1)

90. Ms. Kennedy realleges and incorporates by reference the allegations set forth in the paragraphs above.

91. Ms. Kennedy engaged in protected activity when she reported that she was being discriminated against because of her disability.

92. Barclays failed to take Ms. Kennedy's report seriously, and instead took materially adverse employment action that substantially affected her job against her by forcing her out of work and refusing to allow Plaintiff to return to work without getting clearance from a third-party provider.

93. There was a causal connection between Ms. Kennedy's protected activity of reporting disability discrimination and the aforementioned materially adverse employment action both in terms of temporal proximity between the reporting and the adverse action and also as evidenced by the disability-biased comments from Ms. Kennedy's supervisors at Barclays.

94. Ms. Kennedy was harmed by Barclays' actions.

95. Barclays was well aware of the illegality of its conduct, yet engaged in – with reckless indifference and malice – retaliatory conduct against Ms. Kennedy.

## COUNT V
### Retaliation: FMLA, 29 U.S.C. § 2615(a)

96. Ms. Kennedy incorporates and realleges the paragraphs above as if fully set forth here.

97. Ms. Kennedy was eligible for the FMLA's protections. Prior to needing to take leave to treat her PTSD, Ms. Kennedy had worked for Barclays for at least 1,250 hours during the past 12 months.

13

98. Barclays was covered by the FMLA. It had more than 50 employees within a 75-mile radius of the worksite for each working day in each of 20 or more calendar weeks in the same calendar year as, or in the calendar year prior to, when the discrimination alleged in this case occurred.

99. Ms. Kennedy was entitled to leave under the FMLA. She had a serious medical condition which confined her to the hospital for more than 24 hours and was otherwise medically qualified under the law.

100. Ms. Kennedy promptly notified her employer the day she was hospitalized of her intention to take FMLA leave for a qualifying medical reason.

101. Barclays knew or should have known that Ms. Kennedy's leave was for an FMLA qualifying reason.

102. Barclays disciplined Ms. Kennedy for absences that were covered by the FMLA.

103. There was a causal connection between Ms. Kennedy's taking of protected FMLA leave and her discipline which, according to her manager, could lead to immediate termination. In fact, even though Ms. Kennedy provided a doctor's note confirming that the absences for which she was punished were for medically qualifying purposes, Barclays refused to remove those "occurrences" from Ms. Kennedy's record.

104. The actions complained of above show that Barclays's actions were not taken in good faith with reasonable grounds for believing its acts were not in violation of the FMLA and that Barclays knew or recklessly disregarded its obligations under the FMLA.

105. Ms. Kennedy is entitled to lost wages, salary, employment benefits, and other compensation denied or lost, including interest, as well as an additional amount of liquidated damages equal to the sum of his lost wages, salary, employment benefits, or other compensation denied, plus the interest thereon and equitable relief pursuant to 29 U.S.C. § 2617(a)(1)(A-B).

106. Ms. Kennedy is also entitled to attorneys' fees, expert witness fees and other costs.

## Count VI
## Retaliation: MFMLR, 26 M.R.S. § 847(2)

107. Ms. Kennedy incorporates and realleges the paragraphs above as if fully set forth here.

108. Ms. Kennedy was eligible for the MFMLR's protections. Prior to needing to take leave to treat her PTSD, Ms. Kennedy had worked for Barclays for at least 12 consecutive months.

109. Barclays was covered by the MFMLR. It had 15 or more employees at one location in Maine.

110. Ms. Kennedy was entitled to leave under the MFMLR. She was hospitalized for symptoms related to her PTSD which is a qualifying medical need under the law.

111. Ms. Kennedy promptly notified her employer the day she was hospitalized of her intention to take MFMLR leave for a qualifying medical reason.

112. Ms. Kennedy availed herself of her MFMLR protected rights.

113. Barclays denied Ms. Kennedy her MFMLR benefits to which she was entitled.

114. Barclays disciplined Ms. Kennedy for absences that were covered by the MFMLR.

115. There was a causal connection between Ms. Kennedy's taking of protected MFMLR leave and her discipline which, according to her manager, could lead to immediate termination. In fact, even though Ms. Kennedy provided a doctor's note confirming that the absences for which she was punished were for medically qualifying purposes, Barclays refused to remove those "occurrences" from Ms. Kennedy's record.

116. Barclays's actions constitute a willful violation of the law.

15

117. Ms. Kennedy is therefore entitled to liquidated damages of $100 for each day she was retaliated against for taking MFMLR leave, and twice the amount of lost wages, salary, employment benefits or other compensation under 26 M.R.S. § 848(1)-(2).

## Count VII
### Gender Discrimination: Title VII, 42 U.S.C. § 2000e-2

118. Ms. Kennedy realleges and incorporates by reference the allegations set forth in the paragraphs above.

119. Barclays discriminated against Ms. Kennedy with respect to the compensation, terms, conditions and privileges of employment because of her gender. Ms. Kennedy was targeted and sexually harassed because of her gender. Even though she promptly reported this sexual harassment, Barclays failed to take any steps to investigate the harassment or otherwise take her report seriously. Instead, Ms. Kennedy had to endure working on the same team as her harasser.

120. That gender-based harassment coupled with Barclays' indifference and failure to take her report of said harassment seriously created an intimidating, hostile and offensive working environment. A reasonable person in Ms. Kennedy's position would have found the harassment to be hostile and abusive, and Ms. Kennedy experienced it as such.

121. Although Ms. Kennedy immediately reported the sexual harassment to Barclays, and continued to follow up about what Barclays was doing, the company failed to exercise reasonable care to prevent and promptly correct the sexual harassment. It failed to take the gender discrimination in the form of sexual harassment seriously enough to take any action that would stop it.

122. By failing to take any remedial action in response to Ms. Kennedy's reports, Barclays ratified and approved of the harassment.

123. Barclays acted with malice and with reckless indifference to Ms. Kennedy's protected civil rights. Barclays was motivated by discriminatory intent.

124. As a result of the treatment described in the above Complaint, Ms. Kennedy suffered damages.

## COUNT VIII
### Gender Discrimination: MHRA, 5 M.R.S. § 4572

125. Ms. Kennedy realleges and incorporates by reference the allegations set forth in the paragraphs above.

126. Barclays discriminated against Ms. Kennedy with respect to the compensation, terms, conditions and privileges of employment because of her gender. Ms. Kennedy was targeted and sexually harassed because of her gender. Even though she promptly reported this sexual harassment, Barclays failed to take any steps to investigate the harassment or otherwise take her report seriously. Instead, Ms. Kennedy had to endure working on the same team as her harasser.

127. That gender-based harassment, coupled with Barclays' indifference and failure to take her report of said harassment seriously, created an intimidating, hostile and offensive working environment. A reasonable person in Ms. Kennedy's position would have found the harassment to be hostile and abusive, and Ms. Kennedy experienced it as such.

128. Although Ms. Kennedy immediately reported the sexual harassment to Barclays, and continued to follow up about what Barclays was doing, the company failed to exercise reasonable care to prevent and promptly correct the sexual harassment. It failed to take the gender discrimination in the form of sexual harassment seriously enough to take any action that would stop it.

129. By failing to take any remedial action in response to Ms. Kennedy's reports, Barclays ratified and approved of the harassment.

17

130.   Barclays acted with malice and with reckless indifference to Ms. Kennedy's protected civil rights. Barclays was motivated by discriminatory intent.

131.   As a result of the treatment described in the above Complaint, Ms. Kennedy suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Kennedy prays that this Court enter an Order providing as follows:

A.   Enter judgment declaring that Defendant's practices complained of herein are unlawful as alleged;

B.   Grant Plaintiff a permanent injunction enjoining Defendant, its officers, agents, successors, employees, attorneys and assigns and other representatives, and all persons acting in concert with it and at its direction, from engaging in any employment policy or practice which retaliates against Plaintiff;

C.   Order Defendant to make Plaintiff whole by providing reinstatement and/or front pay, appropriate back pay, and reimbursement for health, medical and other benefits in amounts to be shown at trial;

D.   Order Defendant to pay Plaintiff compensatory damages for non-pecuniary losses, including, but not limited to, severe emotional pain and suffering, mental anguish, humiliation, loss of enjoyment of life, costs associated with obtaining reemployment, embarrassment, and damage to her reputation.

E.   Order Defendant to pay Plaintiff liquidated damages of $100 per day under the MFMLR, 26 M.R.S. § 848(1)(B), plus an additional amount for liquidated damages equal to the amount of unpaid wage, salary, benefits, or other compensation denied under 26 M.R.S. § 848(2), because the violation was willful.

F.  Order Defendant to pay Plaintiff additional liquidated damages under the FMLA, equal to any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation of the FMLA, under 29 U.S.C. § 2617(a)(1)(A)(iii).

G.  Order Defendant to pay litigation costs and expert witness fees;

H.  Order Defendants to pay pre-judgment, post-judgment interest, and reasonable attorneys' fees to Plaintiff;

I.  Order Defendant to pay Plaintiff nominal damages; and

J.  Grant such additional relief as this Court deems appropriate.

/s/ Rebecca S. Webber
Rebecca S. Webber, Esq., Bar No. 7908
Jordan Payne Hay, Esq., Bar No. 5611
Attorneys for Plaintiff, Shanea Kennedy
SKELTON TAINTOR & ABBOTT
95 Main Street
Auburn, ME 04210
(207) 784-3200
rwebber@sta-law.com
jphay@sta-law.com

DATED: January 31, 2019